## TOWN OF WAVELAND v. HANCOCK COUNTY.

[70 South. 561.]

HIGHWAYS. *Road taxes. Dispositions.*

> While Code 1906, sections 4433 and 4469, relating to taxes collected directly for working public roads, provides that one-half of the tax collected on property within a municipality shall be paid to such municipality for street purposes, yet where under Law 1901, chapter 150, the board of county supervisors issued bonds for road purposes, and levied and collected an *ad valorem* tax on all taxable property of the county, including property in a town which worked its own streets, the town was not entitled to one-half of the taxes collected upon Urban property, since such tax was levied in the interest of the bondholders and must be paid to the owners of the bonds.

APPEAL from the circuit court of Hancock county.

HON. JAS. H. NEVILLE, Judge.

Claim by the town of Waveland against Hancock county, the claim being rejected by the board of supervisors, claimant appealed to the circuit court, and from a judgment of the circuit court confirming that of the board, it again appeals.

The facts are fully stated in the opinion of the court.

*Robert L. Genin,* for appellant.

The town bases its claims for said *pro rata* share of the money collected by the county, on section 4469 of the Code of 1906. The county was working its roads under sections 4465 to 4475 inclusive, in connection with chapter 150 of the Laws of 1910. There is no doubt that if the county had collected a direct *ad valorem* tax on the property of the municipality for the purposes of working the county roads outside of the municipality, that the county would be compelled to return to the town, one-half of the amount collected.

This was settled in the case of the *City of Holly Springs* v. *Marshall County,* in 104 Miss. 752.

But if the county borrowed money for road purposes and collected an *ad valorem* tax to pay the indebtedness, would the same rule apply? Manifestly so, because the *ad valorem* tax is collected for the same purpose under the same law in the same manner from the inhabitants of the municipality, and the town derives no additional benefit.

The tax collected in the instant case from the inhabitants of the municipality, may be considered by the county as a bond tax, but in truth and in fact, it is a tax assessed and collected according to the valuation of the property and therefore, an *ad valorem* tax.

The object and purpose of the law enacted by the legislature was to equalize the burden of road building and maintainance between the individuals who pay for their own roads in the city and his urban neighbor and citizen. The wording of the statute is plain, unambiguous, and fully expressive of the intent of lawmakers.

Now can this entire equitable scheme be defeated and the burden double on the tax payer within the municipality simply because the board of supervisors borrowed the money to do their road work? In other words, the law is, that half of the *ad valorem* tax collected out of a town for road purposes by the county, should be returned.

But Hancock county says: ''Oh no; you have no right to that half, now, because this is an *ad valorem* tax collected to pay a debt incurred for road purposes.'' If this rule was sanctioned by the courts, the county could work the roads continuously under sections 4465 and 4475 inclusive, by constantly borrowing the money to do the work, and defeat the very object and intention of the law.

I do not believe that our courts will uphold such juggling of the law and the non-payment of this obligation

simply because the county desired the money in advance to do the road work.

The court held in the case of the *Town of Blue Mountain* v. *Tippah County,* decided by the supreme court on May 3, 1915, that the town had no right to recovery be-because they sued for money derived from a sale of bonds before the county had levied and collected any *ad valorem* tax from the inhabitants of the municipality. That case and the case at bar are essentially different. In our case we ask for one-half of the *ad valorem* tax actually collected from the inhabitants of the municipality of Waveland, and used by the county for the purpose of paying the indebtedness (bonds) incurred for road purposes, not one cent of which was spent in the town.

The court by *dictum* in the *Blue Mountain Case supra,* stated there a proposition, not presented, in the following words: "Money which will be collected from the tax-payers of a town, will of course, have to be paid to the owners of the bond." That rule may be applied in this case, yet would not bar the Town of Waveland from recovery because the board of supervisors of Hancock county are presumed to know the law, and of operating the business of the county to conform thereto, and it must be presumed that the amount due the Town of Waveland out of the *ad valorem* tax that they contemplated collecting by the county from the inhabitants of Waveland must and should have been foreseen and the proper provision by them made to refund that amount. Whether this was done by reserving out of the original amount acquired by the sale of bonds, or by some other special provision, or out of some other general fund, is a matter that should have received advance attention.

*McDonald & Marshall,* for appellant.

In 1892 a general legislative scheme was adopted authorizing counties to work roads by contract and to impose an *ad valorem* tax not to exceed one mill any one

year, in the event the labor of the hands and the commutation taxes and fines were insufficient to accomplish the work. The section authorizing the letting of the roads or a division thereof is 3929, Code of 1892, and the section authorizing the *ad valorem* tax levied on all the property of the county not to exceed one mill was section 3931, Code of 1892. We find for the first time in the laws of Mississippi the general power to levy taxes on property for road purposes in the Code of 1892 and in said section we find this provision:

"Taxes collected on property within a municipality the streets of which are worked at the expense of the municipal treasury, or worked by municipal authority shall be equally divided between the County Road Fund and the Municipal Street Fund."

Evidently the one mill tax was insufficient, because we see in the laws of 1897, page 20, authority to the board of supervisors, for the purpose of paying off any indebtedness on account of the Road Fund, to levy a tax of one mill for the years 1896 and 1897, in addition to that then authorized by law, and also containing this provision:

"Taxes collected in incorporated cities or town, shall be divided as provided in section 3931 of the Annotated Code."

The legislature enacted chapter 119, Laws of 1900, page 153, which while limiting the maximum rate of taxation to one mill, broadened the scheme and authorized inspections of the road by the board of supervisors, and the appointment of a county road commissioner at a monthly salary. It had the same scheme of distribution to municipalities.

We see in the Code of 1906, sections 3929 and 3931 of the Code of 1892, brought forward as sections 4441 and 4443. However, in the Code of 1906, sections 4465 to 4475 inclusive embrace a complete scheme for the working of roads by contract, the appointment of a Commissioner, the requirement of eight days' labor, the levying of a commutation tax and the imposition of an *ad va-*

*lorem* tax. The scheme in the Code of 1892 in the Laws of 1900, and of the Code of 1906, had no effect in any county until put in operation by an order of the board of supervisors. This was a sly way of getting it enacted into law, and is the gauntlet that most progressive legislation has had to run.

Section 4469 of the Code of 1906, authorized a commutation tax and an *ad valorem* tax, which is to be kept as a separate road fund, and requires the commutation tax collected from residents of a municipality to be turned over to the treasurer of such municipality to be expended for street purposes and that "one-half of the *ad valorem* tax collected on property within a municipality shall be paid over to the treasurer thereof, in cases where the streets are worked at the expense of the municipal treasury, or worked at the expense of municipal authority."

So we see from the first legislative act passed in 1892, authorizing the imposition of an *ad valorem* tax, one-half of such tax collected on property within a municipality, working its streets at public expense, and the whole of the commutation tax collected from residents of such municipality, was required to be turned into the treasury of the municipality for street purposes. Commenting on the reason and policy of this mode of distribution the supreme court of this state, in *McComb City v. Pike County,* 91 Miss. 745, says:

"Because the streets are worked by the municipality and are no burden to the county; and, this being the case, it was but just that the municipality should have one-half of the amount raised by taxation of its property for road purposes, when it was keeping its own roads without expense to the county, and also contributed to the maintenance of the county roads. The reason for the exception in behalf of a municipality is that it is maintaining its own streets without any burden to the county, a thing which no other part of the county does. This is the reason why only one-half the tax collected for road

purposes is required to be paid to the county. The reason does not lie in the mere fact that the money is paid out of the municipal treasury to keep up the streets, but that they are kept up without burden to the county."

Thus the obvious purpose of the legislature in making such provision was that in all cases where any municipality assumed the exclusive burden of working its own streets by money appropriated out of its own treasury, its tax-payers should not be subject to an *ad valorem* tax, all of which was to be used on the county roads. It was recognized as an universal and immemorial custom for all municipalities which maintained streets to do so by the labor of its citizens or by their commuted labor and it was also recognized as manifestly unjust and unequal that urban inhabitants should be required to work on country roads, and, at the same time, keep up the streets for their municipality.

However, all these questions have been set finally at rest by the decision in the case of the *City of Holly Springs* v. *Marshall County,* 104 Miss. 752.

But the instant case involves a demand for one-half of the *ad valorem* taxes collected on property within the municipality of Waveland for the years 1911, 1912, 1913, and 1914, for the purpose of creating a fund to pay interest on road bonds, and creating a sinking fund for their liquidation, issued by Hancock county, the proceeds of which bonds have been entirely expended on the county roads in said county, and not one cent of which has been expended or returned to the town of Waveland.

Is there any distinction, under the law, to be drawn between bonds sold by a county and the proceeds used on public roads, and taxes imposed annually in a county, and the amounts realized being expended on the public roads of that county? The theory, policy and very corner-stone of the law is that one-half of the *ad valorem* taxes collected on property in a municipality which works its own streets, for road purposes, shall be re-

turned to that municipality, and the reason and theory of the law is not to be perverted by whipping the devil around the stump and attempting to do, indirectly, what the law prohibits done directly. Section 4469 requires one-half of the *ad valorem* tax to be paid to the town. This was and is an *ad valorem* tax. The fact that it was imposed to pay interests on bonds and create a sinking fund does not make it less an *ad valorem* tax. The nature of the tax is not changed by the use to which it may have been intended. This tax in controversy was a special tax to be used exclusively in paying the interest on said bonds and providing a sinking fund for their redemption, however, if Waveland be entitled to one-half of the amount paid on her property the fact that it was paid into the county treasury and is carried in this special fund, does not prevent this action, because it was improperly paid into the county treasury, instead of being paid to the Town of Waveland and, is not legally a part of said fund.

To admit, as the law says, that one-half of the *ad valorem* tax imposed for roads on property in a municipality, which works its streets, must be turned into the treasury of the municipality by the county, but if it is levied to pay road bonds the proceeds of which have been expended exclusively on county roads, then none of the tax is returned to the municipality, is overturning the policy spirit and the letter of the law. This position is not in conflict with the opinion of the supreme court in the case of the *Board of Aldermen of the Town of Blue Mountain* v. *Board of Supervisors of Tippah County*, decided by the Supreme Court on May 3, 1915. In that case, Blue Mountain was sueing for a proportion of the money derived from the sale of road bonds without any assessment having been made and before any *ad volorem* taxes had been collected on the property in said municipality. Of course, this could be done because the thing that the municipality is entitled to have returned, is one-half of the actual *ad valorem* taxes paid by it, and until

paid there was nothing, under the law, for it to legally make demand for. This independent sentence is in the opinion in that case:

"The money which will be collected from tax-payers of the town will, of course, have to be paid to the owners of the bonds."

The application of taxes to be collected was not involved in that case. However, said statement can only mean that one-half of the money collected on property in the town will have to be paid to owners of the bonds.

*E. J. Gex,* for appellee.

Assuming that there is something in the contention of appellant that they are entitled to the money asked for, let us for the sake of argument see where this money is going to come from. Can they collect this money from the money that the county has raised by providing for a sinking fund to pay off this indebtedness and to pay interest? We think not, as the bondholder would come in and say you can't do this as I bought your bonds on the faith of section 331 which says that "you shall levy annually a Special Tax, to be used exclusively in paying the interest on such bonds, and in providing a sinking fund for their redemption." Any other use of said money would be defeating and nullyfying of said section. And this court very recently realized that any such thing could not be done when it said through COOK, J., in the case of *Blue Mountain* v. *Board of Sup. of Tippah County,* 68 So. 250: "The money which will be collected from the tax payers of the town will of course have to be paid to the owners of the bonds."

One of the attorneys for appellant (see brief of R. L. Genin, page 3), realizes the seriousness of this proposition but tries to overcome this objection by saying, "That rule may be applied in this," speaking of the above opinion of COOKE, J., "yet would not bar the Town of Waveland from recovery because the board of Super-

visors of Hancock county are presumed to know the law, and of operating the business of the county to conform thereto, and it must be presumed that the amount due the Town of Waveland out of the *ad valorem* tax that they contemplated collecting by the county from the inhabitants of Waveland, must and should have been foreseen and the proper provision by them made to refund that amount. Whether this was done by reserving out of the original amount acquired by the sale of bonds, or by some other special provision, or out of some other general funds, was a matter that should have received advance attention." I have set this out in full so that we might find according to appellant's contention, or any other contention as to how or where money is to come from to pay Waveland if they are entitled to said money. Surely it cannot be contended that this very bond issue could be used to pay Waveland (*Blue Mountain* v. *Tippah County, supra*), and for the further reason that this money cannot be used for any other purpose than issued for. Then could the money be taken out of the General Fund? What would be the effect if Waveland was paid out of the General Fund? The result would be that Waveland would file another claim against the county for one-half the amount paid it because we had paid a road debt out of money that it had helped pay and had not received its one-half from, and this would continue forever, with claim after claim.

Another thing that ocurs to us is that section 4469 provides for a limit of three mills for road purpose and of which the city is to get one-half of the money collected within the city limits providing the city worked its own road. If the levy made to pay off bonds had to be divided cities instead of receiving one-half of three mills would in some cases get as much as five and six mills, something never intended by the legislature. Lets presume another case. Suppose Hancock county was working under the overseer system when bond issue was made and spent one-half of the bond issue under the

overseer system when the county decided to change its system of working the roads from the overseer system to the contract system. What portion of the amount to be collected would have to be turned over to the city that worked its own road? Again suppose when the bond issue was made that the county was operating under overseer system and had spent all of its money while operating under that system and changed to contract system, then would the city be entitled to anything and if so to what? If it was the intention of the legislature to give to cities working their own roads one-half of the money collected from the said cities, why did the legislature enact chapter 174 of the Laws of 1912, and why should chapter 255 of the Laws of 1914, be enacted? We are frank to admit that these are questions that we cannot answer and are questions that will have to be answered before appellant can get any money?

To make section 4469 elastic enough to cover contention of appellant would mean the abolishing of section 331 of Code and the repealing of *Blue Mountain* v. *Tippah, supra,* and the stretching of section 4469 to such a point that the party that drew up the said statute would not recognize it if it stared him in the face; things which we do not believe this court will do.

Stevens, J., delivered the opinion of the court.

The municipality of Waveland presented to the board of supervisors of Hancock county for allowance a claim for two thousand, seven hundred and seventy dollars and sixty-one cents, being one-half of *ad valorem* taxes collected for the years 1911, 1912, 1913, and 1914 on the taxable property within the corporate limits of said town to pay the interest on certain road bonds issued by Hancock county and to create a sinking fund for the liquidation of said bonds. The claim of appellant was rejected by the board of supervisors, and on appeal to the circuit court the order of the board was affirmed, and from

this judgment of the circuit court affirming the action
of the board of supervisors, appellant prosecutes this
appeal.

The agreed statement of facts shows that the board of
supervisors of Hancock county, by an order passed Sep-
tember 7, 1910, adopted chapter 150, Laws of 1910, for
working the roads of said county, and continued to
work and maintain its roads under said chapter, and
amendments thereto, until August, 1914, when it put into
operation the provisions of sections 4465 to 4475, Code of
1906, as an additional method for working its public
roads. In September, 1910, the board issued bonds for
road purposes in the sum of one hundred thousand dol-
lars, and the proceeds were credited to the road fund of
the county and expended in the construction and work-
ing of roads outside of the town of Waveland, which
works its own streets. The board levied and collected for
the years 1911, 1912, 1913, and 1914 an *ad valorem* tax
on all of the taxable property of the county for the pur-
pose of paying the interest on said road bonds and of
creating a sinking fund for the retirement of said bonds.
From taxable property situated in the town of Waveland
the net sum of five thousand, five hundred and forty-one
dollars, and twenty-two cents was collected for the years
mentioned, and one-half of this sum appellant demands
under sections 4433 and 4469, Code of 1906.

The taxes provided for by sections 4433 and 4469, Code
of 1906, are taxes collected directly for working the pub-
lic roads, and the proceeds of these taxes are credited
to the proper road fund and expended on roads. These
statutes expressly provide that one-half of the tax so
collected on property within a municipality shall be paid
to such municipality for street purposes. The tax, for
a portion of which a demand is here made, was not
levied under either of said sections of the Code, and was
not levied to raise funds to be spent directly upon the
roads. The tax here in question was levied to pay
interest on road bonds and to create a sinking fund there-

for. There is no statute authorizing any portion of this tax to be paid to a municipality. In the absence of such statute, the board of supervisors of Hancock county, of course, had no authority to allow the claim here presented by appellant. There must be statutory authority justifying such allowance. The validity of the tax imposed on property within the corporate limits of the municipality is not involved. This tax has been levied and collected, and the owners of taxable property within the town have borne the burden without question. The town in its corporate capacity now makes claim in nature of a refund for a proportionate part of this tax. As indicated by this court in the case of *Board of Aldermen of the Town of Blue Mountain* v. *Board of Supervisors of Tippah County,* 68 So. 250, the money here involved is to be paid to the owners of the bonds. It was levied in the interest of the bondholders.

We think the action of the circuit court was correct, and its judgment is affirmed.

*Affirmed.*